**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, California 92130
Telephone:     (858) 997-0860
Facsimile:     (858) 369-0096

*Counsel for Employees' Retirement System of the*
*City of Baltimore, City of Philadelphia Board of*
*Pensions and Retirement, and Plymouth County*
*Retirement Association, and Proposed Lead*
*Counsel for the Class*

*[Additional Counsel Listed on Signature Page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PEIFA XU, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>     vs.<br><br>FIBROGEN, INC., ENRIQUE CONTERNO, JAMES SCHOENECK, and K. PEONY YU,<br><br>     Defendants. | No. 3:21-cv-02623-EMC<br><br>**CLASS ACTION**<br><br>**MEMORANDUM IN FURTHER SUPPORT OF THE MOTION OF EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BALTIMORE, CITY OF PHILADELPHIA BOARD OF PENSIONS AND RETIREMENT, AND PLYMOUTH COUNTY RETIREMENT ASSOCIATION FOR CONSOLDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF COUNSEL, AND IN OPPOSITION TO THE COMPETING MOTIONS**<br><br>HEARING DATE: July 22, 2021<br>TIME: 1:30 p.m.<br>JUDGE: Hon. Edward N. Chen<br>COURTROOM: 5 – 17th Floor |

| | |
|---|---|
| ROBERT GUTMAN, Individually and on Behalf of All Others Similarly Situated, | No. 3:21-cv-02725-YGR |
| Plaintiff, | Judge Yvonne Gonzalez Rogers |
| vs. | **CLASS ACTION** |
| FIBROGEN, INC., ENRIQUE CONTERNO, and JAMES SCHOENECK, | |
| Defendants. | |
| CESARE GRAZOLI, Individually and on Behalf of All Others Similarly Situated, | No. 3:21-cv-03212-CRB |
| Plaintiff, | Judge Charles R. Breyer |
| vs. | **CLASS ACTION** |
| FIBROGEN, INC., ENRIQUE CONTERNO, JAMES SCHOENECK, and K. PEONY YU, | |
| Defendants. | |
| THOMAS LEONARD, Individually and on Behalf of All Others Similarly Situated, | No. 5:21-cv-03370-BLF |
| Plaintiff, | Judge Beth Labson Freeman |
| vs. | **CLASS ACTION** |
| FIBROGEN, INC., ENRIQUE CONTERNO, JAMES SCHOENECK, and K. PEONY YU, | |
| Defendants. | |
| IBEW LOCAL 353 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | No. 5:21-cv-03396-EJD |
| Plaintiff, | Judge Edward J. Davila |
| vs. | **CLASS ACTION** |
| FIBROGEN, INC., ENRIQUE CONTERNO, JAMES SCHOENECK, and K. PEONY YU, | |
| Defendants. | |

## **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................... 1

II.     STATEMENT OF THE ISSUES TO BE DECIDED ............................................. 3

III.    ARGUMENT .......................................................................................................... 3

      A.      The Retirement Systems' Motion Should Be Granted........................................... 3

            1.      The Retirement Systems Have the Largest Financial Interest of Any Movant ....................................................................................................... 3

            2.      As Sophisticated and Experienced Institutional Investors, the Retirement Systems Are an Ideal Lead Plaintiff and Clearly Satisfy the Typicality and Adequacy Requirements of Rule 23 ............................. 6

      B.      The Competing Motions Should Be Denied ............................................................ 7

            1.      Sepulveda Does Not Have the Largest Financial Interest and Is Unfit to Represent the Class .......................................................................... 7

            2.      Stefano Branca and Giuliana Mollo Do Not Have the Largest Financial Interest ....................................................................................... 13

IV.     CONCLUSION ..................................................................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Andrada v. Atherogenics, Inc.*,
   No. 05-cv-00061 (RJH), 2005 WL 912359 (S.D.N.Y. Apr. 19, 2005)....................................10

*Applestein v. Medivation Inc.*,
   No. 10-cv-00998 MHP, 2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) ..................................11

*Bang v. Acura Pharm., Inc.*,
   No. 10-cv-5757, 2011 WL 91099 (N.D. Ill. Jan. 11, 2011)........................................................10

*Basile v. Valeant Pharm. Int'l, Inc.*,
   No. SACV142004DOCANX, 2015 WL 13652714 (C.D. Cal. May 5, 2015)............................4

*Born v. Quad/Graphics, Inc.*,
   No. 19-cv-10376, 2020 WL 994427 (S.D.N.Y. Mar. 2, 2020) ......................................................8

*Bricklayers of W. Pennsylvania Pension Plan v. Hecla Min. Co.*,
   No. 12-cv-00042-BLW, 2012 WL 2872787 (D. Idaho July 12, 2012).............................5, 9, 10

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v.
   Pluralsight, Inc.*,
   No. 1:19-cv-128, 2020 WL 1452136 (D. Utah Mar. 25, 2020) .....................................................4

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   No. 11-cv-04003 LHK, 2012 WL 78780 (N.D. Cal. Jan. 9, 2012).........................................3, 4

*Cook v. Allergan plc*,
   No. 18-cv-12089, 2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019)...............................................11

*Deering v. Galena Biopharma, Inc.*,
   No. 3:14-cv-00367, 2014 WL 4954398 (D. Or. Oct. 3, 2014)......................................................8

*Dura Pharmaceuticals Inc. v. Broudo*,
   544 U.S. 336 (2005) ...........................................................................................................2, 4, 5, 9

*Felix v. Symantec Corp.*,
   No. 18-cv-02902 WHA, 2018 WL 4029053 (N.D. Cal. Aug. 23, 2018)....................................3

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
   No. 2:20-cv-00368, 2021 WL 913934 (D. Utah Mar. 10, 2021) ...............................................10

*Hodges v. Akeena Solar, Inc.*,
   263 F.R.D. 528 (N.D. Cal. 2009)................................................................................................6

*Hurst v. Enphase Energy, Inc.*,
No. 20-cv-04036-BLF, 2020 WL 7025085 (N.D. Cal. Nov. 30, 2020)...................................... 9

*In re Aqua Metals Sec. Litig.*,
No. 17-cv-07142-HSG, 2018 WL 4860188 (N.D. Cal. May 23, 2018)..................................... 7

*In re Bank One Shareholders Class Actions*,
96 F. Supp. 2d 780 (N.D. Ill. 2000) ...................................................................................... 11

*In re Bausch & Lomb Inc. Sec. Litig.*,
244 F.R.D. 169 (W.D.N.Y. 2007)........................................................................................... 8

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002)............................................................................................. 1, 7

*In re Comverse Tech., Inc. Sec. Litig.*,
No. 06-cv-1825, 2007 WL 680779 (E.D.N.Y. Mar. 2, 2007)...................................................... 4

*In re Elan Corp. Sec. Litig.*,
No. 1:08-cv-08761-AKH, 2009 WL 1321167 (S.D.N.Y. May 11, 2009) ............................. 9, 10

*In re Snap Inc. Sec. Litig.*,
No. 2:17-cv-03679-SVW-AGR, 2019 WL 2223800 (C.D. Cal. Apr. 1, 2019) ........................ 11

*Inchen Huang v. Depomed, Inc.*,
289 F. Supp. 3d 1050 (N.D. Cal. 2017) ............................................................................ 6, 13

*Lax v. First Merchants Acceptance Corp.*,
No. 97 C 2715, 1997 WL 461036 (N.D. Ill. Aug. 11, 1997) ...................................................... 3

*McCracken v. Edwards Lifesciences Corp.*,
8:13-cv-1463-JLS (RNBx), 2014 WL 12694135 (C.D. Cal. Jan. 8, 2014) ................................ 6

*Nasin v. Hongli Clean Energy Techs. Corp.*,
No. 2:17-cv-3244, 2017 WL 5598214 (D.N.J. Nov. 21, 2017) ................................................ 13

*Perlmutter v. Intuitive Surgical, Inc.*,
No. 10-cv-03451 LHK, 2011 WL 566814 (N.D. Cal. Feb. 15, 2011) ........................... 3, 5, 8, 9

*Reinschmidt v. Zillow, Inc.*,
No. 12-cv-2084-RSM, 2013 WL 1092129 (W.D. Wash. Mar. 14, 2013) ................................ 10

*Scheller v. Nutanix, Inc.*,
No. 19-cv-01651-WHO, 2021 WL 2410832 (N.D. Cal. June 10, 2021)................................ 1, 8

*Woburn Ret. Sys. v. Omnivision Techs., Inc.*,
No. 11-cv-05235-RMW, 2012 U.S. Dist. LEXIS 21590 (N.D. Cal. Feb. 21, 2012) .................. 6

**STATUTES**

15 U.S.C. § 78u-4(a)(3)(B) ............................................................................................. 3, 6

28 U.S.C. § 1746 .............................................................................................................. 13

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369 (1995) ................................................................................. 6

RETIREMENT SYSTEMS' OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:21-CV-02623-EMC

The Retirement Systems respectfully submit this response in further support of their motion for appointment as Lead Plaintiff (ECF No. 29) and in opposition to the two remaining competing motions filed by Vincente Sepulveda ("Sepulveda") (ECF No. 22) and Stefano Branca and Guiliana Mollo ("Branca and Mollo") (ECF No. 40).[1]

## I.   INTRODUCTION

The Retirement Systems have the largest financial interest in the litigation, are the presumptive "most adequate plaintiff," and should be appointed as the Lead Plaintiff. The Retirement Systems incurred a total loss on their Class Period purchases of FibroGen common stock in excess of *$1.33 million*—hundreds of thousands of dollars more than the loss claimed by any competing movant.   Indeed, Baltimore Employees' and Philadelphia *alone* each incurred losses larger than those of any qualified movant.   Moreover, the Retirement Systems are sophisticated public institutions that collectively manage over $8.5 billion in assets and have highly successful track records serving cooperatively with other pension funds as lead plaintiffs—recovering nearly a quarter of a billion dollars in complex securities class actions.  *See* ECF No. 30-4 at 2-5; *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002) ("So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, [plaintiff] is entitled to lead plaintiff status[.]").

By contrast, Sepulveda, who claims the second highest loss, suffers from a myriad of fatal deficiencies.   First, Sepulveda cannot be appointed lead plaintiff because he *substantially profited* from the fraud as both a "net seller" and a "net gainer" of FibroGen shares.  Sepulveda sold 11,900 more shares than he purchased during the Class Period and netted over $460,000 from these transactions.   Courts arecognize that movants like Sepulveda who are *both* net sellers *and* net gainers are effectively disqualified from serving as lead plaintiff because they are atypical and "subject to [the] unique defense[]" that they profited from the fraud. *See Scheller v. Nutanix, Inc.*, 2021 WL 2410832, at *7 (N.D. Cal. June 10, 2021).

[1] Unless otherwise noted, all capitalized but undefined terms have the meanings ascribed in the Retirement Systems' opening brief (ECF No. 29), all emphasis is added, and citations are omitted. Two other movants, Brett Richard and Thomas Leonard, filed motions seeking appointment as lead plaintiff (ECF Nos. 18 and 37), but Mr. Richard withdrew his motion on June 14, 2021 (ECF No. 48), and Mr. Leonard filed a notice of non-opposition on June 25, 2021 (ECF No. 49).

RETIREMENT SYSTEMS' OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:21-CV-02623-EMC

Sepulveda also cannot be appointed as Lead Plaintiff because his trading belies any reliance on the Defendants' misstatements. During the Class Period, Sepulveda engaged in an extremely high volume of in-and-out transactions in FibroGen common stock, including extensive day trading and serial liquidations of his entire position on thirty occasions. Sepulveda similarly engaged in an extremely high volume of transactions in FibroGen call and put options, trading in 59 different options contracts and at times taking inconsistent positions, such as flip flopping between long and short positions. Not only does this highly atypical trading activity threaten Sepulveda's ability to rely on the bedrock fraud-on-the-market presumption of reliance, it also grossly exaggerates Sepulveda's financial interest in the litigation. Indeed, the overwhelming majority of Sepulveda's stock and options were not held over *any* corrective disclosure and thus any resulting losses bear no causal relationship to the fraud under the Supreme Court's decision in *Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005).

Sepulveda's personal conduct also dramatically undermines his motion. As set forth in Exhibit A to the Declaration of David R. Kaplan in Support of the Retirement Systems' Opposition (the "Kaplan Opposition Declaration"), Sepulveda evidently made dozens—if not hundreds—of public internet posts about FibroGen during the Class Period. For example, Sepulveda (aka "EduTeacher") vocally defended FibroGen executives when they sold their shares in the Company, claiming that the sales "*mean absolutely NOTHING in regards to the insider's [sic] views of the stock.*" In other posts, Sepulveda claimed he knew that Defendants had been "*manipulating*" the stock price for five years, and that the CEO "*has got to pump the stock to make his pay*." These posts provide ample fodder for Defendants, who will inevitably argue that Sepulveda took positions publicly that undermine any allegations of scienter, and that he did not rely on the integrity of the market when making his purchases. Appointing Sepulveda ensures that this litigation will be sidetracked by these unique issues and could at worst, leave the Class without representation.

The remaining movant, Branca and Mollo, also has a significantly smaller financial interest than that of the Retirement Systems under any metric, and their motion should be denied.

## II.   STATEMENT OF THE ISSUES TO BE DECIDED

(1) Whether consolidation is appropriate under Rule 42(a) because the above-captioned actions "involve a common question of law and or fact."

(2) Whether the Retirement Systems should be appointed as Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(iii) because the Retirement Systems are the movant asserting the largest financial interest that also makes a threshold showing of typicality and adequacy under Rule 23 and is not subject to unique defenses.

(3) Whether the Retirement Systems' selection of Saxena White as Lead Counsel for the Class should be approved pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).

## III.   ARGUMENT

### A.   The Retirement Systems' Motion Should Be Granted

#### 1.   The Retirement Systems Have the Largest Financial Interest of Any Movant

The Retirement Systems have the largest financial interest in the relief sought by the Class by a substantial margin.  Courts in this District consider the "*Lax*" factors when identifying which movant has the largest financial interest: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 11-cv-04003 LHK, 2012 WL 78780, at *4 (N.D. Cal. Jan. 9, 2012) (citing *Lax v. First Merchants Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).  Courts applying the *Lax* factors "generally place the greatest emphasis of the last of these factors," *i.e.*, the "approximate loss suffered." *Id.*; *see Felix v. Symantec Corp.*, No. 18-cv-02902 WHA, 2018 WL 4029053, at *2 (N.D. Cal. Aug. 23, 2018) (noting that "'approximate loss,' is generally considered the most important factor").  Courts also carefully scrutinize a movant's "net shares purchased" and "net funds expended" because such factors shed light on whether the movant will be able to establish that it was damaged by the alleged fraud. *See Perlmutter v. Intuitive Surgical, Inc.*, No. 10-cv-03451 LHK, 2011 WL 566814, at *8 (N.D. Cal. Feb. 15, 2011) (explaining that net purchasers have a strong financial interest in the action because

they were "induced by the fraud to purchase shares and [have] been left 'holding the bag' when the fraud was eventually revealed," as compared to net sellers, who "profit[ ] more from the fraud than suffer[ ] from it").

As set forth in the chart below, the Retirement Systems have a substantially larger financial interest than all competing applicants under the three key *Lax* factors of total loss, net shares purchased, and net funds expended. *See In re Comverse Tech., Inc. Sec. Litig.*, No. 06-cv-1825, 2007 WL 680779, at *7 (E.D.N.Y. Mar. 2, 2007) (appointing institutional investor group that had "the greatest number of relevant net shares purchased, net funds expended, and suffered the greatest loss"). Under the most important factor, the Retirement Systems incurred **hundreds of thousands of dollars more** in losses than the next largest movant. *See, e.g.*, *Juniper Networks*, 2012 WL 78780 *4 (appointing a group of public retirement systems with the largest aggregated loss as lead plaintiffs); *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Pluralsight, Inc.*, No. 1:19-cv-128, 2020 WL 1452136, at *1 (D. Utah Mar. 25, 2020) (appointing "Pluralsight Institutional Investors Group," which had the largest aggregated financial interest); *Basile v. Valeant Pharm. Int'l, Inc.*, No. SACV142004DOCANX, 2015 WL 13652714, at *1 (C.D. Cal. May 5, 2015) (appointing group of two institutional investors with "biggest financial stake in this case").

[Remainder of page intentionally omitted]

| MOVANT | TOTAL SHARES PURCHASED | NET SHARES PURCHASED/ (SOLD) | NET FUNDS EXPENDED | ASSERTED LIFO LOSS |
|---|---|---|---|---|
| **Retirement Systems** | 71,420 | 49,318 | $2,340,770 | $1,330,943 |
| Sepulveda Common Stock | 209,548 | (11,900) | ($460,668) | $300,500* |
| Sepulveda Options | 9,207 (contracts) | (247) (contracts) | $579,697 | $646,147*[2] |
| **Sepulveda Total** | N/A[3] | N/A[3] | $119,029 | $946,647* |
| **Branca and Mollo** | 21,549 | 21,549 | $548,973 | $459,057 |

Importantly, nearly **90%** of the Retirement Systems' losses were incurred on shares purchased and held over **all** of the alleged corrective disclosures. Thus, the Retirement Systems' losses bear a strong causal connection to the fraud, underscoring the Retirement Systems' large financial stake in the claims. *Dura*, 544 U.S. at 336; *see Perlmutter,* 2011 WL 566814, at *4-6 (noting that, under "the Supreme Court's holding in *Dura* …. Ninth Circuit authority favors considering loss causation on a motion for appointment as lead plaintiff").

Notably, the Retirement Systems would still be the most adequate plaintiff even if their respective financial interests were analyzed in isolation. Specifically, Baltimore Employees and Philadelphia Pension Fund each incurred a LIFO loss larger than **any** competing movant on their transactions in FibroGen common stock—$505,254 and $475,238, respectively. ECF No. 30-3. In addition, as discussed below, Baltimore Employees and Philadelphia Pension Fund each incurred

---

[2] As described further *infra* at 9, this loss figure is inflated as it includes losses on short-term options that were sold or expired before any corrective disclosure—*i.e.*, losses not causally related to FibroGen's fraud.

[3] The total shares purchased and net shares purchased factors cannot be calculated across Sepulveda's stock and options trades because they are different securities involving different prices and valuations. *See Bricklayers of W. Pennsylvania Pension Plan v. Hecla Min. Co.*, No. 12-cv-00042-BLW, 2012 WL 2872787, at *4 (D. Idaho July 12, 2012) (recognizing that a *Lax* analysis "is not helpful" when analyzing options trading because "the price and value of a single share of common stock is very different from the price and value of a single call option"). Sepulveda acknowledges as much by not supplying totals for these *Lax* factors. *See* ECF No. 23-3 at 2.

a LIFO loss larger than any competing movant across *all* securities when losses on short-term options are properly analyzed. *See infra* at 9; *see also Inchen Huang v. Depomed, Inc.*, 289 F. Supp. 3d 1050, 1055 (N.D. Cal. 2017) (appointing movant group whose member had the "greatest financial stake in the litigation of any movant"); *McCracken v. Edwards Lifesciences Corp.*, No.: 8:13-cv-1463-JLS (RNBx), 2014 WL 12694135, at *3 (C.D. Cal. Jan. 8, 2014) (concluding that institutional investor group had the largest financial interest because a component member had the largest individual loss); *Woburn Ret. Sys. v. Omnivision Techs., Inc.*, No. 11-cv-05235-RMW, 2012 U.S. Dist. LEXIS 21590, *13 (N.D. Cal. Feb. 21, 2012) (appointing lead plaintiff group where "one of its members alone . . . ha[d] a larger [financial] stake than any other individual plaintiff"); *Hodges v. Akeena Solar, Inc.*, 263 F.R.D. 528, 533 (N.D. Cal. 2009) (same).

Accordingly, under any relevant calculation, Retirement Systems have the "largest financial interest in the relief sought by the class" and are entitled to be appointed Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

> **2.    As Sophisticated and Experienced Institutional Investors, the Retirement Systems Are an Ideal Lead Plaintiff and Clearly Satisfy the Typicality and Adequacy Requirements of Rule 23**

As sophisticated and experienced institutional investors each with a sizeable financial stake in the litigation, the Retirement Systems are exactly the type of plaintiffs Congress sought to encourage to lead securities class actions. *See* H.R. Conf. Rep. No. 104-369, at *34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733 (1995) ("The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions.").

The Retirement Systems are very experienced in prosecuting securities class actions, having successfully served as responsible class fiduciaries in numerous cases. *See* Joint Declaration, ECF No. 30-4 ¶¶ 3, 4, 14 (citing securities class actions in which Philadelphia Pension Fund and Plymouth County have successfully served as lead plaintiff, including with other institutional investors); *see also Edwards Lifesciences*, 2014 WL 12694135, at *4 (finding that "prior experience serving as lead plaintiff in securities class actions" by certain members of institutional investor group demonstrated adequacy). Judge Gilliam, for example, has expressly noted that "Plymouth

County Retirement Association, having previously served as a lead and co-lead plaintiff in similar cases, is ***particularly well suited to represent the putative class in this matter***." *In re Aqua Metals Sec. Litig.,* No. 17-cv-07142-HSG, 2018 WL 4860188, at *3 (N.D. Cal. May 23, 2018) (appointing Plymouth County to serve as lead plaintiff as part of a cohesive investor group).

The Retirement Systems have made a preliminary showing that they satisfy Rule 23 and are ideally suited to serve as lead plaintiff, and accordingly are the presumptive lead plaintiff pursuant to the PSLRA.

### B.    The Competing Motions Should Be Denied

Because the Retirement Systems have met all the requirements for appointment as lead plaintiff, the Court need not consider the competing motions. *See In re Cavanaugh*, 306 F.3d at 732 ("The statutory process is sequential: The court must examine potential lead plaintiffs one at a time, starting with the one who has the greatest financial interest, and continuing in descending order if and only if the presumptive lead plaintiff is found inadequate or atypical."). Even if the Court were to do so, it would find that, in addition to having a significantly smaller financial interest than the Retirement Systems, certain of the competing movants are subject to unique defenses that render them incapable of adequately representing the Class.

### 1.    Sepulveda Does Not Have the Largest Financial Interest and Is Unfit to Represent the Class

#### a)   Sepulveda is Disqualified from Serving as Lead Plaintiff as a Net Seller and Net Gainer Who Unquestionably Benefited from the Fraud and Has a De Minimis *Dura* Loss

The vast majority of Sepulveda's claimed loss derives not from investments in common stock but from investments in options.[4]  Sepulveda's claimed LIFO loss from common stock is only $300,500—a loss smaller than those of ***all*** other movants. *See supra* at 5.

Moreover, Sepulveda is a net seller and net gainer on his transactions in FibroGen shares. While Sepulveda claims a $300,500 LIFO loss on his Class Period transactions in FibroGen common stock, he admits that he sold 11,900 more shares than he purchased during the Class

---

[4] The vast majority of Class members invested in common stock as the volume of transactions in FibroGen common stock was nearly 9 times greater than the volume of transactions in FibroGen shares underlying options contracts traded on U.S. exchanges during the Class Period according to Bloomberg.

Period, rendering him a "net seller," and that he realized ***$460,668*** on those transactions, rendering him a "net gainer." *See* ECF No. 23-3 at 2 (noting positive net expenditures on Class Period transactions). Courts uniformly reject such movants because their trading pattern strongly suggests that they benefitted from the defendant's fraud and thus will be unable to establish damages. *See Perlmutter*, 2011 WL 566814, at *9 (noting that "the fact that [movant] received more money from selling stock at fraudulently inflated prices than he spent purchasing stock at inflated prices makes it more likely that [movant] benefitted from Defendants' alleged fraud").

Indeed, as Judge Orrick explained just weeks ago, "a net seller arguably profits more from the fraud than suffers from it" and is "subject to unique defenses." *Nutanix*, 2021 WL 2410832, at *6, *7; *see also Born v. Quad/Graphics, Inc.*, No. 19-cv-10376, 2020 WL 994427, at *2 (S.D.N.Y. Mar. 2, 2020) (collecting cases from across the country uniformly holding that net sellers who are also net gainers are "effectively disqualifie[d]" from serving as lead plaintiff); *Deering v. Galena Biopharma, Inc.*, No. 3:14-cv-00367, 2014 WL 4954398, at *11 (D. Or. Oct. 3, 2014) ("[C]ourts . . . consistently have rejected applications for lead plaintiff made by net sellers and net gainers, recognizing the difficulty of proving damages at trial."); *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173 (W.D.N.Y. 2007) ("Courts have consistently rejected applications for lead plaintiff status made by 'net sellers' and 'net gainers,' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices.").

While Sepulveda claims to have expended more money than he received on FibroGen securities, there can be no question that Sepulveda benefitted from the fraud—the purpose of the net seller and net gainer analysis. The $460,668 in net proceeds that Sepulveda realized from selling shares during the Class Period at inflated prices ***fully offsets*** his $300,500 asserted LIFO loss and his true options loss. *See Perlmutter*, 2011 WL 566814, at *9 (discrediting largest claimed loss due to his "status as a net seller and a net gainer during the Class Period"); *Nutanix*, 2021 WL 2410832, at *7 ("The fact that [movant] gained approximately $1.2 million from the sale of Nutanix shares during the [c]lass [p]eriod [which fully offset his $743,104 loss] undermines his assertion that he 'suffered sizeable losses.'").

Next, Sepulveda's options trading presents even more serious issues that undercut his

RETIREMENT SYSTEMS' OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:21-CV-02623-EMC

purported financial interest.   Sepulveda transacted in 59 different options contracts, and concentrated in short-term call options with dates expiring as soon as 2 days from the date of purchase and, on average, just 105 days, or 3.5 months, from purchase.

First, Sepulveda's $646,147 claimed LIFO loss on FibroGen options grossly exaggerates his financial interest in this litigation because it includes losses that clearly are *not* causally connected to the fraud.  Indeed, Sepulveda held *only 6* of the 59 separate option contracts he purchased during the Class Period over one or more of the pleaded corrective disclosures, and his loss on those investments was just $98,405—less than *one-fifth* of his claimed options losses.  *See* Kaplan Opp. Decl. Ex. B.  The remaining *four-fifths* of Sepulveda's claimed loss—approximately $550,000—was incurred through hundreds of transactions on options that were never held over a corrective disclosure and thus do not give rise to any cognizable claim.[5]  *See In re Elan Corp. Sec. Litig.*, No. 1:08-cv-08761-AKH, 2009 WL 1321167, at *1 (S.D.N.Y. May 11, 2009) (concluding that "a more accurate figure of [movant's] total losses" on call options should exclude options sold before corrective disclosure); *see also Hurst v. Enphase Energy, Inc.*, No. 20-cv-04036-BLF, 2020 WL 7025085, at *3 (N.D. Cal. Nov. 30, 2020) (noting that "private securities fraud actions are intended 'not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause'") (*citing Dura*, 544 U.S. at 345).

Second, Sepulveda's remaining $98,405 in *potentially* recoverable options losses (*i.e.*, those that were incurred on contracts held over a partial corrective disclosure) present other challenges.  Courts have recognized that a traditional *Lax* analysis "is not helpful" when analyzing options trading because "the price and value of a single share of common stock is very different from the price and value of a single call option." *Hecla Mining*, 2012 WL 2872787, at *4.  Among other things, "[t]he options' valuable lives are limited, their value is conditional, and there is a large disparity between their price and their potential value." *Id.*[6]  For example, Sepulveda would have

---

[5] By contrast, 88% of the Retirement Systems' losses were incurred in connection with long-term investments in FibroGen common stock held through *all* the alleged disclosures and, thus, causally connected to the fraud. *See* ECF 30-3; *see also Perlmutter,* 2011 WL 566814, at *4-6.

[6] Similarly, "comparing damage calculations for purchasers of stock and purchasers of options is

*Footnote continued on next page*

to present "specialized expert testimony," to show that not only did the corrective disclosure cause fraudulent stock-price inflation to dissipate, but that the disclosure prevented the underlying stock from reaching the strike price in the options contracts. *Gelt Trading*, 2021 WL 913934, at *5; *see also Elan*, 2009 WL 1321167, at *2 (explaining that among other things, the valuation of stock options introduces a wide variety of factual issues "irrelevant to stockholder class members, like strike price, duration, maturity, volatility, and interest rates"); *Hecla Mining*, 2012 WL 2872787, at *4 (appointing institutional investor group whose common stock losses were significantly less than competing movant's options losses because the option trader's "relevant loss" was only about one-third of its claimed loss).[7]

### b) Sepulveda's Highly Unusual Trading Renders Him Atypical and Inadequate

Sepulveda also engaged in extremely unusual and atypical trading strategies that render him an inadequate representative for the Class. As reflected in his unwieldy 44-page loss analysis, Sepulveda engaged in no fewer than **665 transactions** in FibroGen securities during the Class Period and liquidated his common stock investments alone at least **thirty different times**, demonstrating he was likely trading on market volatility rather than reliance on the Company's statements. *See Reinschmidt v. Zillow, Inc.*, No. 12-cv-2084-RSM, 2013 WL 1092129, at *4 (W.D. Wash. Mar. 14, 2013) (finding that potential lead plaintiff who "trad[ed] on market volatility" was subject to unique defense); *Bang v. Acura Pharm., Inc.*, No. 10-cv-5757, 2011 WL 91099, at *6 (N.D. Ill. Jan. 11, 2011) ("[U]nusually high-volume and high-frequency trading can raise challenges to typicality and raise a unique defense regarding lack of reliance on material misstatements and omissions."); Sepulveda's Common Stock Transactions, Kaplan Opp. Decl. Ex. C.

like 'comparing apples and oranges." *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, No. 2:20-cv-00368, 2021 WL 913934, at *5 (D. Utah Mar. 10, 2021).

[7] Given the different manner in which options holders must demonstrate damages, courts frequently find options holders atypical to represent classes including common stock investors. *See Andrada v. Atherogenics, Inc.*, No. 05-cv-00061 (RJH), 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) ("As an options holder, [the proposed lead plaintiff] is potentially subject to unique defenses irrelevant to regular stock purchasers in the class[.]"); *Gelt Trading*, 2021 WL 913934, at *5 (rejecting motion of options holder because he "would introduce factual issues irrelevant to stockholder class members . . . and he could subject the class to unique defenses, causing unnecessary conflict").

Sepulveda also frequently engaged in day trading, having bought and sold large positions in FibroGen common stock on the same day, or the very next day, ***on at least 15 separate occasions***. *See* Kaplan Opp. Decl. Ex. C; *Applestein v. Medivation Inc.*, No. 10-cv-00998 MHP, 2010 WL 3749406, at *3 (N.D. Cal. Sept. 20, 2010) (finding that purchasing and selling issuer's stock on the same day nine times during the Class Period precluded appointment).  Like his extreme common stock trading, he also engaged in nearly ***500*** transactions involving 59 separate and distinct options, the majority of which were sold very soon after purchase[8] and none of which were exercised.  *See* ECF No. 23-3; *In re Snap Inc. Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2019 WL 2223800, at *3 (C.D. Cal. Apr. 1, 2019) (rejecting presumptive lead plaintiff who partook in "in-and-out" trading).

In addition, while the vast majority of Sepulveda's options trading strategy focused on call options, he also purchased put options, betting on a ***decline*** in FibroGen's stock price.  Specifically, on three occasions, Sepulveda bought put options in the hopes that the price of FibroGen stock would decline, including for the same strike price and same expiration date as call options, in which he invested in the hopes FibroGen's stock price would appreciate.  ECF No. 23-3 at 2, 4. These conflicting investment strategies provide ample ammunition for Defendants to challenge Sepulveda's reliance on the Company's misstatements and his ability to represent the Class.  *See Cook v. Allergan plc*, No. 18-cv-12089, 2019 WL 1510894, at *2 (S.D.N.Y. Mar. 21, 2019) (disqualifying movant who transacted in both call and put options during the Class Period); *In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 784 (N.D. Ill. 2000) (disqualifying movant on basis of unusual trading patterns, giving preference to a "handful of institutional investors who make up the Pension Group with greater aggregate claimed losses").

### c) Sepulveda's Online Statements Concerning FibroGen Render Him Inadequate and Atypical

Finally, Sepulveda's public commentary specific to FibroGen renders him atypical and

---

[8] Sepulveda also frequently sold his option positions within a day or a few short days of purchasing them. *See, e.g.*, ECF No. 23-3 at ECF pgs. 22, 28, 30, 42 (reflecting, for example, that Sepulveda purchased put options on February 25, 2019 that he liquidated on February 26, 2019, and that he purchased and liquidated call options within a single day on multiple occasions, including from March 6, 2019 to March 7, 2019, September 3, 2020 to September 4, 2020, and February 11, 2021 to February 12, 2021).

RETIREMENT SYSTEMS' OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:21-CV-02623-EMC

inadequate. As set forth in Exhibit A to the Kaplan Opposition Declaration, even a cursory review of Sepulveda's online messaging activity shows that Sepulveda was highly prolific in creating public posts about FibroGen during the Class Period in which he expressed personal views contrary to the Class's interests. *See* Vince Sepulveda (@EduTeacher), Stocktwits.com (Nov. 18, 2019 to March 4, 2020), https://stocktwits.com/EduTeacher, a copy of which is attached as Exhibit A to Kaplan Opp. Decl.

For example, Sepulveda publicly claimed on February 12, 2020 that the value of FibroGen stock "*was manipulated during the previous 5 years*" and, on January 6, 2020, effectively encouraged this manipulation, noting that the new CEO "*has got to pump the stock to make his pay*." *Id.* at 2, 3 (Feb. 12, 2020, 2:14 PM posting) & (Jan. 6, 2020 5:45 PM posting). Notwithstanding his expressed view that the stock price was being "manipulated," Sepulveda purchased tens of thousands of shares and hundreds of option contracts after he made these posts—essentially attempting to capitalize on what he believed was a manipulated stock price. This is the antithesis of typicality. Sepulveda also took positions in his posts that may well be directly contradictory to allegations that plaintiffs make in this case. For example, Sepulveda repeatedly defended Company management when they sold their shares in the Company, claiming that the sales "mean absolutely NOTHING in regard to the insider's [sic] views on the stock" and that "these events with the FGEN Officers mean absolutely nothing in regards to their sentiment of the stock." *Id.* at 9, 5 (Nov. 18, 2019, 11:01 AM posting) & (Dec. 7, 2019 11:34 AM posting). In publicly excusing Class Period stock sales by insiders while the stock traded at artificially inflated prices, Sepulveda has shown his hand. Sepulveda will not properly investigate insider sales—a potentially powerful scienter allegation in this case.

At minimum, these posts will raise numerous unique defenses at the class certification stage and throughout the case. Defendants will undoubtedly argue that Sepulveda's own admissions clearly show both that he did not rely on the integrity of the market when making his purchases, and that he believed that Defendants' insider selling was not evidence of scienter. At worst, Sepulveda's lengthy, long-running arm-chair analyses of FibroGen stock and its management could leave the Class with no representation.

For these many reasons, Sepulveda would be an inadequate and atypical Class representative and his motion should be denied.

### 2. Stefano Branca and Giuliana Mollo Do Not Have the Largest Financial Interest

Branca and Mollo, who apparently reside in Italy, claim a combined loss of approximately $459,000, well below the loss asserted by Retirement Systems.[9]  *See* ECF No. 40.  In fact, that **combined** loss is less than the financial interest of either Baltimore Employees ($505,254) or Philadelphia Pension Fund ($475,238) alone.  *Compare* ECF No. 41-4 *with* ECF No. 30-3.  Branca and Mollo are therefore not the most adequate lead plaintiffs.  *See Depomed*, 289 F. Supp. 3d at 1054-55 (appointing lead plaintiff group where a single group member's financial interest was larger than other remaining movants).

## IV.   CONCLUSION

For the foregoing reasons, the Retirement Systems respectfully request that this Court: (1) consolidate the Related Actions; (2) appoint the Retirement Systems as Lead Plaintiff; (3) approve the Retirement Systems' selection of Saxena White to serve as Lead Counsel for the Class; and (4) grant such other and further relief as the Court may deem just and proper.

Dated:  June 25, 2021                    Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ David R. Kaplan*
David R Kaplan (SBN 230144)
dkaplan@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, California 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

---

[9] Branca and Mollo's motion also should be rejected because they failed to file valid certifications prior to the 60-day deadline established by the PSLRA.  Neither Branca's nor Mollo's certifications are proper pursuant to 28 U.S.C. § 1746(2), as they were both executed in Italy—outside of the United States—yet fail to make Branca and Mollo subject to "penalty of perjury **under the laws of the United States of America**."  *See Nasin v. Hongli Clean Energy Techs. Corp.*, No. 2:17-cv-3244, 2017 WL 5598214, at *3 (D.N.J. Nov. 21, 2017) (rejecting lead plaintiff movants for failing to timely comply with 28 U.S.C. § 1746, finding they would be subject to unique defenses).

Maya Saxena
msaxena@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

Steven B. Singer
Rachel A. Avan
ssinger@saxenawhite.com
ravan@saxenawhite.com
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 216-2220

*Counsel for Employees' Retirement System of the City of Baltimore, City of Philadelphia Board of Pensions and Retirement, and Plymouth County Retirement Association, and Proposed Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on June 25, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

*/s/ David R. Kaplan*
David R. Kaplan

RETIREMENT SYSTEMS' OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:21-CV-02623-EMC