Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for [Proposed] Lead Plaintiff
Vicente Sepulveda*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEIFA XU, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>        v.<br><br>FIBROGEN, INC., ENRIQUE CONTERNO, JAMES SCHOENECK, and K. PEONY YU,<br><br>                          Defendants. | No.  3:21-cv-02623-EMC<br><br>CLASS ACTION<br><br>**REPLY IN FURTHER SUPPORT OF MOTION TO CONSOLIDATE THE RELATED ACTIONS, APPOINT VICENTE SEPULVEDA AS LEAD PLAINTIFF, AND APPROVE HIS SELECTION OF LEAD COUNSEL**<br><br>Date: Thursday, July 22, 2021<br>Time: 1:30 p.m.<br>Courtroom: 5, 17th Floor<br>Judge: Hon. Edward M. Chen<br><br>ORAL ARGUMENT REQUESTED |

[Caption continued on the next page.]

010998-11/1567823 V3

| | |
|---|---|
| CESARE GRAZIOLI, Individually and on Behalf of All Others Similarly Situated, | No.  3:21-cv-03212-CRB |
| | CLASS ACTION |
| Plaintiff, | |
| v. | |
| FIBROGEN, INC., ENRIQUE CONTERNO, JAMES SCHOENECK, and K. PEONY YU, | |
| Defendants. | |
| THOMAS LEONARD, Individually and on Behalf of All Others Similarly Situated, | No.  5:21-cv-03370-EMC |
| | CLASS ACTION |
| Plaintiff, | |
| v. | |
| FIBROGEN, INC., ENRIQUE CONTERNO, JAMES SCHOENECK, and K. PEONY YU, | |
| Defendants. | |
| IBEW LOCAL 353 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | No.  5:21-cv-03396-EJD |
| | CLASS ACTION |
| Plaintiff, | |
| v. | |
| FIBROGEN, INC., ENRIQUE CONTERNO, JAMES A. SCHOENECK, and K. PEONY YU, | |
| Defendants. | |

010998-11/1567823 V3

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................................1

II.   ARGUMENT ...............................................................................................................3

    A.    Sepulveda Has the Largest Financial Interest .............................................3

    B.    Sepulveda Was Not a Net Gainer ................................................................5

    C.    *Dura* Does Not Support the Appointment of the Competing Movants ........7

    D.    Mr. Sepulveda Is Not Atypical for Trading in Option Contracts ..............11

    E.    Mr. Sepulveda's Trading during the Class Period Was Not Atypical ........12

    F.    Sepulveda's Online Statements Concerning FibroGen Underscore His
        Adequacy and Typicality ...........................................................................13

    G.    Alternatively, Mr. Sepulveda Should be Appointed Co-Lead Plaintiff ....15

III.  CONCLUSION ...........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afr. v. Jianpu Tech. Inc.*,
  2021 WL 1999467 (S.D.N.Y. May 19, 2021) ........................................................................ 10

*Andrada v. Atherogenics, Inc.*,
  2005 WL 912359 (S.D.N.Y. Apr. 19, 2005) ........................................................................... 12

*Applestein v. Medivation Inc*,
  2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) ...................................................................... 12

*In re AudioEye, Inc. Sec. Litig*,
  2015 WL 13654027 (D. Ariz. Aug. 3, 2015) ........................................................................... 6

*In re Bausch & Lomb Inc. Sec. Litig.*,
  244 F.R.D. 169 (W.D.N.Y. 2007) ........................................................................................... 6

*Bodri v. GoPro, Inc.*,
  2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) ................................................................. 2, 3, 4

*Born v. Quad/Graphics, Inc.*,
  2020 WL 994427 (S.D.N.Y. Mar. 2, 2020) ............................................................................. 6

*Bricklayers of W. Pa. Pension Plan v. Hecla Min. Co.*,
  2012 WL 2872787 (D. Idaho July 12, 2012) ........................................................................ 12

*Cook v. Allergan PLC*,
  2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) .............................................................. 3, 4, 7, 8

*Deering v. Galena Biopharma, Inc.*,
  2014 WL 4954398 (D. Or. Oct. 3, 2014) ................................................................................. 6

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................................*passim*

*In re Elan Corp. Sec. Litig.*,
  2009 WL 1321167 (S.D.N.Y. May 11, 2009) ........................................................................ 12

*In re Enron Corp. Sec. Litig.*,
  206 F.R.D. 427 (S.D.Tex. 2002) ............................................................................................. 1

*Fialkov v. Celladon Corp.*,
  2015 WL 11658717 (S.D. Cal. Dec. 9, 2015) .......................................................................... 8

*Frank v. Dana Corp.*,
237 F.R.D. 171 (N.D. Ohio 2006) .......................................................................................6

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
2021 WL 913934 (D. Utah Mar. 10, 2021) ........................................................................12

*In re Gentiva Sec. Litig.*,
281 F.R.D. 108 (E.D.N.Y. 2012).........................................................................................8

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
No. 1:10-cv-03461-PAC (S.D.N.Y. Jan. 30, 2015).............................................................11

*Goldstein v. Puda Coal, Inc.*,
827 F. Supp. 2d 348 (S.D.N.Y. 2011) ...............................................................................11

*Hall v. Medicis Pharm. Corp.*,
2009 WL 648626 (D. Ariz. Mar. 11, 2009).......................................................................11

*Hurst v. Enphase Energy, Inc.*,
2020 WL 7025085 (N.D. Cal. Nov. 30, 2020) ...............................................................2, 10

*In re McKesson HBOC, Inc. Sec. Litig.*,
97 F. Supp. 2d 993 (N.D. Cal. 1999).................................................................................4, 5

*Medina v. Clovis Oncology, Inc.*,
2016 WL 660133 (D. Colo. Feb. 18, 2016)........................................................................11

*Micholle v. Ophthotech Corp.*,
2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018).....................................................................12

*Miller v. Ventro Corp.*,
2001 WL 34497752 (N.D. Cal. Nov. 28, 2001) ..................................................................15

*Mullen v. Wells Fargo & Co.*,
2021 WL 965344 (N.D. Cal. Mar. 15, 2021) .......................................................................3

*Mulligan v. Impax Lab'ys, Inc.*,
2013 WL 3354420 (N.D. Cal. Jul. 2, 2013) ....................................................................2, 10

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
293 F.R.D. 483 (S.D.N.Y. 2013).......................................................................................11

*Nicolow v. Hewlett Packard Co.*,
2013 WL 792642 (N.D. Cal. Mar. 4, 2013) ......................................................................3, 4

*Omdahl v. Farfetch Ltd.*,
2020 WL 3072291 (S.D.N.Y. June 10, 2020) ......................................................................3

*Perlmutter v. Intuitive Surgical, Inc.*,
   2011 WL 566814 (N.D. Cal. Feb.15, 2011)...............................................................5, 6, 10

*In re Petrobras Sec. Litig.*,
   104 F. Supp. 3d 618 (S.D.N.Y. 2015) ..................................................................................1

*Plumbers & Pipefitters Loc. 562 Pension Fund v. MGIC Inv. Corp.*,
   256 F.R.D. 620 (E.D. Wis. 2009)........................................................................................9

*Reinschmidt v. Zillow, Inc.*,
   2013 WL 1092129 (W.D. Wash. Mar. 14, 2013)..................................................................5

*Robb v. Fitbit Inc.*,
   2016 WL 2654351 (N.D. Cal. May 10, 2016).......................................................................7

*Scheller v. Nutanix, Inc.*,
   2021 WL 2410832 (N.D. Cal. June 10, 2021).......................................................................6

*Schueneman v. Arena Pharms., Inc.*,
   2011 WL 3475380 (S.D. Cal. Aug. 8, 2011).......................................................................13

*In re Stitch Fix, Inc. Sec. Litig.*,
   393 F. Supp. 3d 833 (N.D. Cal. 2019)................................................................................12

*Takara Tr. v. Molex Inc.*,
   229 F.R.D. 577 (N.D. Ill. 2005) ..........................................................................................3

*Tesla. Isaacs v. Musk*,
   2018 WL 6182753 (N.D. Cal. Nov. 27, 2018) ...................................................................11

*In re Tesla, Inc. Sec. Litig.*,
   2018 WL 6609569 (N.D. Cal. Dec. 17, 2018) .................................................................5, 6

*In re UTStarcom, Inc. Sec. Litig.*,
   2010 WL 1945737 (N.D. Cal. May 12, 2010).......................................................................6

*In re Watchguard Sec. Litig.*,
   2005 U.S. Dist. LEXIS 40923 (W.D. Wash. July 13, 2005).........................................7, 8, 10

*In re Wrap Techs., Inc. Sec. Exch. Act Litig.*,
   2021 WL 71433 (C.D. Cal. Jan. 7, 2021).............................................................................4

**Statutes**

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb)...........................................................................................5

**Other Authorities**

Financial Industry Regulation Authority Rule 4210(f)(8)(B)(i) ..................................................13

## I.      PRELIMINARY STATEMENT

After two rounds of briefing, it is undisputed that Mr. Sepulveda suffered the greatest individual out-of-pocket loss of any lead plaintiff applicant on his investments in FibroGen securities during the Class Period.[1] Indeed, among the remaining candidates, Mr. Sepulveda is the only movant to have suffered substantial losses on both FibroGen common stock and options resulting from trades that occurred within all of the Related Actions' alleged class definitions. Thus, Mr. Sepulveda is best positioned to comprehensively and adequately represent the entire class harmed by Defendants' fraud. Mr. Sepulveda's background as a licensed CPA and testifying trial expert, experience managing and overseeing attorneys in litigation, and selection of highly qualified and experienced trial counsel, further underscores his fitness to represent the class. ECF No. 23-4 at ¶¶ 2-4, 6-7.

The two remaining applicants cannot compete with this showing. As demonstrated in Mr. Sepulveda's opposition, the Retirement Systems is a group of three separate pension funds from three separate states, cobbled together by counsel for the sole purpose of combining losses. *See* ECF No. 50 at 5-7. The "artificial group" has no pre-litigation relationship, done nothing collectively to advance this litigation, and failed to articulate a concrete plan for managing this case in a cohesive manner. *Id*. And, as if these disqualifying factors were not enough, the group relies on a questionable assignment from a fourth pension fund; thereby adding a whole new set of unique defenses and inefficiency risks, and further confirming this lawyer-driven grouping is a "manipulated effort to aggregate [the] largest loss[]."[2] *Id*. at 7-9. The other competing movant, Mollo-Branca, a nephew and aunt who reside in Italy, claim a fraction of Mr. Sepulveda's LIFO losses. *See* ECF Nos. 41-3, 41-4.

Now, seeing that they lack the largest loss, the competing movants argue for the application of other tests to diminish Mr. Sepulveda's financial interest, without explaining why the LIFO losses they emphasized just weeks ago are no longer a reliable indicator. *See* ECF Nos. 51 at 2-3; ECF No. 52 at 9. For example, the competing movants urge the Court to apply a results-driven analysis that they

---

[1] Unless otherwise defined herein, all capitalized terms shall maintain the same meaning as those set forth in Mr. Sepulveda's Opposition. *See* ECF No. 50.

[2] *In re Enron Corp. Sec. Litig*., 206 F.R.D. 427, 455–57 (S.D.Tex. 2002) (rejecting lawyer-driven grouping of institutional investors to claim the largest loss); *In re Petrobras Sec. Litig*., 104 F. Supp. 3d 618, 622 (S.D.N.Y. 2015) (same).

inaccurately assert is supported by *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*"). *Id.* Of course, the newly proposed "*Dura* Eligible Losses" methodology – which purports to exclude losses on "in and out" transactions that took place during the class period but before the alleged fraud was revealed to the public – was nowhere to be seen in their original moving papers. *Cf.* ECF Nos. 29 at 2, 10; 30-3; 40 at 4; and 41-4. "This fact alone counsels in favor of adopting the [original] methodology, as opposed to the [new *Dura* loss] methodology."[3]

Regardless, the competing movants' own authorities militate against using a *Dura* loss methodology here at the lead plaintiff stage. *See* ECF No. 51 at 7; ECF No. 52 at 9. Unlike a conventional, single stock drop case over a short time frame, this action alleges a multiyear class period, covering all FibroGen securities (including options), and involves a litany of partial disclosures. As a result of these partial disclosures and the various alleged misrepresentations and omissions during the nearly three and one-half year Class Period, the "fraud premium"—the amount by which the prices of securities were artificially inflated—likely varied over time and by security; a fact completely ignored by the competing movants' proposed "*Dura* Eligible Losses" methodology. Thus, even under the competing movants' case law, applying a *Dura* loss method here would be improper.[4]

Moreover, the competing movants' "*Dura*" argument is predicated on the assumption that the only disclosures of the fraud are those identified in the complaints filed to date. But Mr. Sepulveda has already identified at least one additional disclosure, which is not reflected in the filed complaints: a February 2018 announcement that the timelines for the pivotal roxadustat anemia program would be pushed back, a materialization of the risk caused by Defendants' concealment of the drug's true safety profile.[5] Thus, given that FibroGen's misconduct leaked out at various points during the Class Period,

[3] *Bodri v. GoPro, Inc.*, 2016 WL 1718217, at \*3 (N.D. Cal. Apr. 28, 2016) (noting that movants focused "exclusively" on "losses" in their motions and rejecting attempt to switch metrics).

[4] *See, e.g.*, *Hurst v. Enphase Energy, Inc.*, 2020 WL 7025085, at \*3-4 (N.D. Cal. Nov. 30, 2020) (acknowledging difficulty in applying *Dura* "where there are multiple partial corrective disclosures over a long period of time."); *Mulligan v. Impax Lab'ys, Inc.*, 2013 WL 3354420, at \*7 (N.D. Cal. Jul. 2, 2013) (same).

[5] *See* Declaration of Lucas E. Gilmore in Further Support of Motion to Appoint Vicente Sepulveda as Lead Plaintiff ("Gilmore Reply Decl."), Ex. A-C, filed concurrently herewith.

Mr. Sepulveda's purported "in and out" transactions are very likely compensable, even under *Dura*.[6]

Next, the competing movants' manufacture a number of meritless typicality challenges that misrepresent Mr. Sepulveda's actual Class Period trading. In so doing, the competing movants counterintuitively align themselves with Defendants in attacking class members that traded in FibroGen options, despite the fact that these investors fall squarely within the Related Actions' class definitions.

Finally, the Retirement Systems selectively excerpt and distort various online statements Mr. Sepulveda made concerning FibroGen to suggest Mr. Sepulveda encouraged stock price manipulation. The argument is pure fallacy. When the passages are read in full and in proper context, Mr. Sepulveda's posts demonstrate his reliance on Defendants' false statements and the integrity of the market, and that his interests are aligned with those of the Class.

In sum, Mr. Sepulveda and his counsel are fully prepared to pursue litigation on behalf of all proposed class members against FibroGen and the Individual Defendants. Mr. Sepulveda's motion should be granted.

## II.   ARGUMENT

### A.   Sepulveda Has the Largest Financial Interest

Courts almost universally acknowledge that the approximate loss suffered is the most important factor in assessing financial interest.[7] When calculating estimated losses, courts invariably use the last-in-first-out (LIFO) method.[8] Apart from comporting with "[t]he weight of authority," the LIFO calculation – which assumes the first stocks to be sold are the ones purchased most recently prior to

---

[6] *See Cook v. Allergan PLC*, 2019 WL 1510894, at *3 (S.D.N.Y. Mar. 21, 2019) (rejecting movant's "convoluted [*Dura*] loss calculation methodology at the expense of [] considerably more straightforward calculations").

[7] *See, e.g.*, *Mullen v. Wells Fargo & Co.*, 2021 WL 965344, at *3 (N.D. Cal. Mar. 15, 2021) (collecting cases) ("Consistent with the plain language of Section 78u, the fourth [*Lax-Olsten* factor], approximate loss, calculation matters most."); *Omdahl v. Farfetch Ltd.*, 2020 WL 3072291, at *2 (S.D.N.Y. June 10, 2020) ("The last factor, financial loss, is the most important of the four."); *Takara Tr. v. Molex Inc.*, 229 F.R.D. 577, 579 (N.D. Ill. 2005) ("[M]ost courts simply determine which potential lead plaintiff has suffered the greatest total losses.").

[8] *See, e.g.*, *Bodri v. Gopro, Inc.*, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016); *Nicolow v. Hewlett Packard Co.*, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013).

REPLY IFSO MOT. TO CONSOL. REL. CASES, APPOINT LEAD PL. AND APPROVE COUNSEL     - 3
Case No.: 3:21-cv-02623-EMC
010998-11/1567823 V3

that sale – avoids artificially inflating losses with market activity outside of the class period. *See Bodri v. Gopro, Inc.*, 2016 WL 1718217, at *3.

Mr. Sepulveda has, by far, the largest individual LIFO loss of any movant, nearly doubling the next largest individual applicant's LIFO loss. *Cf*. ECF Nos. 23-3, 30-3, 41-4. Relying on well-settled authority, the Retirement Systems and Mollo-Branca, like all other movants, initially argued that the Court should base their financial interest analysis on their LIFO losses on all FibroGen securities. *See* ECF No. 29 at 2, 10; ECF 40 at 4. Indeed, LIFO losses were the only calculation the Retirement Systems and Mollo-Branca presented in support of their motions. *See* ECF Nos. 30-3; 41-4.

Only after realizing that they did not possess the largest individual LIFO loss, the Retirement Systems and Mollo-Branca switched gears to suggest that the Court should elevate the importance of alternative *Lax-Olsen* factors, ignore transactions in FibroGen securities other than common stock, and adopt alternative estimated loss calculations. But the competing movants provide no reason for changing course, and courts routinely reject such eleventh-hour shifts in strategy as gamesmanship.[9]

Disregarding this authority and the facts of this case, the Retirement Systems first seem to argue that the Court should place additional weight to net shares purchased and net funds expended. ECF No. 52 at 4-5. But the net shares factor is of particularly limited import here given that the Class includes multiple purchases of securities other than stock, such as the FibroGen options that Mr. Sepulveda traded. *See In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996 (N.D. Cal. 1999) (finding net shares "provides little insight" when different securities are involved). The existence of numerous partial disclosures of the fraud further minimizes the importance of the "net shares" metric, which looks only to the shares held as of the final corrective disclosure. *See Gopro, Inc.*, 2016

---

[9] *See Hewlett Packard Co.*, 2013 WL 792642, at *4 (denying motion by movant who "[t]ellingly . . . made no reference to net shares purchased or a retained shares calculation in its opening motion seeking appointment as lead plaintiff, shifting its argument only after [a competing movant] came forward with larger LIFO losses."); *In re Wrap Techs., Inc. Sec. Exch. Act Litig.*, 2021 WL 71433, at *2 (C.D. Cal. Jan. 7, 2021) (refusing to adopt alternative loss calculation where [competing movant] raised the *Dura* loss calculation only in opposition after finding [presumptive lead plaintiff] had a greater LIFO loss."); *Allergan*, 2019 WL 1510894, at *3 (the fact that a movant that initially presented its losses under LIFO and "alter[ed] its calculation [to *Dura*] when it learned that someone else had a larger loss – lends validity to the conclusion that the impact of *Dura* on the proposed lead plaintiffs' loss calculations is at best uncertain, and so should be discounted.").

WL 1718217, at *3.

As to net funds expended, courts only give this factor more weight where the investor was a "net seller/net gainer," and therefore "has arguably profited more from the fraud than it has been injured, possibly reducing its incentive to litigate." *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d at 997; *Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814 (N.D. Cal. Feb.15, 2011). Where, as here, the movant claims to have expended more than $100,000 in net proceeds during the class period, the factor is given minimal consideration and LIFO losses remain determinative. *See Reinschmidt v. Zillow, Inc.*, 2013 WL 1092129, at *2 (W.D. Wash. Mar. 14, 2013) (rejecting retirement funds' contention that their higher values for net shares purchased and net funds expended tipped the financial interest calculus in their favor, where individual investor claimed larger LIFO loss).

Next, the Retirement Systems emphasize that members Baltimore Employees and Philadelphia Pension Fund each incurred a LIFO loss larger than any competing movant on their transactions in FibroGen common stock.  ECF No. 50 at 5. But the *Olsen-Lax* total loss factor intends to measure the competing movants' relative "financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  Here, the class seeks relief for investments in all FibroGen securities, including the buying of call options and selling of put options; therefore, measuring total LIFO losses on FibroGen common stock only is improper. Accordingly, because Mr. Sepulveda suffered the largest individual LIFO loss on the securities at issue, Mr. Sepulveda has the "largest financial interest."

**B.    Sepulveda Was Not a Net Gainer**

The Retirement Systems' argument that Mr. Sepulveda should be disqualified for being a purported "net seller/net gainer" is misplaced, as the Retirement Systems again limit the scope of the inquiry to Mr. Sepulveda's class period common stock trading and ignore Sepulveda's options transactions. ECF No. 52 at 7-8. Indeed, in *In re Tesla, Inc. Sec. Litig.*, 2018 WL 6609569, at *2 (N.D. Cal. Dec. 17, 2018), this Court rejected a similar attempt by a competing movant to brand an investor as a net seller/net gainer, observing that the argument ignored the impact of that investor's put option trading.  In addition, the Court analyzed Judge Koh's opinion in *Perlmutter*, 2011 WL 566814, the primary case relied on by Retirement Systems in advancing its net seller/net gainer argument. ECF

No. 52 at 4. ***First***, the Court emphasized that *Perlmutter* holds that the net seller/net gainer analysis is not the "'the same as determining whether a party lost or earned money trading in a particular stock,' which would involve analysis of pre- or even post-class period transactions." *Tesla*, 2018 WL 6609569, at \*3. ***Second***, the Court found *Perlmutter* distinguishable from actions like the instant case, as the *Perlmutter* class was defined as those "'who purchased or acquired Intuitive stock during the Class Period,'" and "[t]here was no claim that investors trad[ed] in options." *Id*. ***Third***, the Court observed that the net seller/net gainer analysis conducted in *Perlmutter* was simply one means of trying to figure out whether a party had, as a "net" matter, benefitted from the alleged fraud. *Id*. "Nothing in *Perlmutter* says that the net seller/net gainer analysis is dispositive, particularly where an explanation is given as to how a seller has been hurt from the fraud."[10]

Here, the Court's analysis in *Tesla* applies with equal force since this case covers option traders. Moreover, even isolating the inquiry to common stock, Mr. Sepulveda lost $300,500 from his transactions in common stock during the Class Period when matched using the LIFO methodology. Mr. Sepulveda's matched losses show that Mr. Sepulveda did not profit from the fraud and therefore is typical of other members of the Class who traded in common stock.[11] Simply put, Mr. Sepulveda is not a net gainer as result of transactions in FibroGen securities, and should not be excluded based on the Retirement Systems' skewed net seller/net gainer inquiry.

---

[10] The Retirement Systems' other cited authorities on this point are unavailing. ECF No. 52 at 8. None of the cases stands for the proposition that the Court should look only to the movant's common stock transactions, and ignore trades in other covered securities, in determining whether the movant is a net seller/net gainer. *See Scheller v. Nutanix, Inc.*, 2021 WL 2410832, at \*7 (N.D. Cal. June 10, 2021) (net seller/net gainer traded only in common stock); *Born v. Quad/Graphics, Inc.*, 2020 WL 994427, at \*2 (S.D.N.Y. Mar. 2, 2020) (same); *Deering v. Galena Biopharma, Inc.*, 2014 WL 4954398, at \*11 (D. Or. Oct. 3, 2014) (same); *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173 (W.D.N.Y. 2007) (same).

[11] *See e.g. In re AudioEye, Inc. Sec. Litig,* 2015 WL 13654027, at \*5 (D. Ariz. Aug. 3, 2015) ("the courts in the Ninth Circuit and elsewhere have repeatedly held that a 'net seller' can be a lead plaintiff or class representative, as long as it has a recoverable loss."); *Frank v. Dana Corp.,* 237 F.R.D. 171, 173 (N.D. Ohio 2006) (rejecting net seller/net gainer argument as "The City's claims concerning the [movant]'s losses are not well-founded. In its reply memorandum, [movant] notes that it suffered a loss even on its holdings of Dana securities that predated the alleged fraud. . . . Accordingly, though the PTFG may have been a net seller, it should have no trouble proving damages and, therefore, is qualified to serve as lead plaintiff."); *In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at \*6 (N.D. Cal. May 12, 2010) (finding movant typical despite arguments he was a net seller and net gainer because when the movant's sales were matched to purchases it showed that movant suffered a net loss).

**C.**    ***Dura* Does Not Support the Appointment of the Competing Movants**

Next, the competing movants contend that the Court should disregard LIFO losses and instead scrutinize the multiple disclosures of the alleged fraud to determine financial interest by applying an oversimplified interpretation of loss causation principles espoused in *Dura*. *See* ECF No. 50 at 8-10; ECF No. 51 at 3-4. Tellingly, neither the Retirement Systems nor Mollo-Branca provided this method for calculating financial interest in their moving papers. To the contrary, in presenting their loss calculations for Philadelphia and Plymouth, the Retirement Systems included purported "in-and-out losses" they now seek to exclude. ECF No. 30-3 at 4-5. *See Robb v. Fitbit Inc*., 2016 WL 2654351, at *5 n.8 (N.D. Cal. May 10, 2016) (stating that court was "not persuaded" by one movant's "alternative loss calculations" based on *Dura* that were raised in "its opposition and reply briefs" in part because "the movants disagree as to whether this calculation method is valid").

Putting aside the inconsistencies in Retirement Systems' and Mollo-Branca's competing analyses of financial interest, many courts decline to apply a loss causation methodology premised on *Dura* at the lead plaintiff appointment stage because doing so requires the court to prematurely delve into a complicated merits analysis where expert opinion is needed. *See, e.g., Allergan*, 2019 WL 1510894, at *3 (declining to conduct a "*Dura*" analysis to determine financial interest at the lead plaintiff stage); *Blitz*, 2012 WL 1192814, at *4 (noting that *Dura* "was not a case involving the appointment of a Lead Plaintiff under the PSLRA, and *Dura* does not discuss FIFO or LIFO losses"). That is, applying the competing movants' "*Dura*" approach requires the Court to identify the disclosures of the alleged fraud that caused compensable losses. Because "numerous factors may affect the price of a security," in its opinion in *Dura*, "[t]he Supreme Court did not suggest that a court should guess about the effect of these as-yet-unknown factors in selecting a lead plaintiff, nor did it consider the issue." *In re Watchguard Sec. Litig.*, 2005 U.S. Dist. LEXIS 40923, at *15 n.6 (W.D. Wash. July 13, 2005).

Courts have further recognized that engaging in a "*Dura*" analysis at the lead plaintiff stage is not appropriate when the case involves a long class period with multiple alleged corrective disclosures and a varying "fraud premium," which thereby confounds the calculation of recoverable losses. *See*

REPLY IFSO MOT. TO CONSOL. REL. CASES, APPOINT LEAD PL. AND APPROVE COUNSEL        - 7
Case No.: 3:21-cv-02623-EMC
010998-11/1567823 V3

*Allergan*, 2019 WL 1510894, at *3 (varying fraud premium made it "unwise to embrace . . . [a] convoluted [*Dura*] loss calculation methodology at the expense of . . . considerably more straightforward [LIFO] calculations"); *Fialkov v. Celladon Corp.*, 2015 WL 11658717, at *5 (S.D. Cal. Dec. 9, 2015) (rejecting *Dura* analysis where there were partial corrective disclosures). That is precisely the case here, where several factors likely caused the fraud premium to vary, including the three and a half year long class period, multiple corrective disclosures, drastic stock price fluctuations, and information misrepresented and concealed from the public changing over time. It is for these reasons that the "most illuminating" metric is "approximate loss, the only factor that makes no assumptions regarding the fraud premium." *Watchguard*, 2005 U.S. Dist. LEXIS 40923, at *16; *Allergan*, 2019 WL 1510894, at *3 (rejecting *Dura* methodology in case involving a multi-year class period and multiple partial disclosures); *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 117 (E.D.N.Y. 2012) (rejecting "contention that other movants improperly included regular trading losses from earlier stock sales that are not recoverable under the federal securities laws").

Moreover, the competing movants improperly limit their "*Dura*" analysis to the corrective disclosures alleged in the complaints filed to-date. That approach is premature and unduly narrow, as Mr. Sepulveda, through his diligent investigation, already has identified at least one additional corrective disclosure on February 27, 2018. On that date, FibroGen announced that it had pushed back the timelines for the pivotal roxadustat anemia program, stating the key cardiovascular MACE efficacy data would not be completed until the fourth quarter 2018, moving its target date for its submission of its U.S. NDA for Roxadustat for anemia in Chronic Kidney Disease to sometime during the first half of 2019. Gilmore Reply Decl., Ex A. On a conference call that same day, in response to analyst inquiry concerning the timeline for releasing the data for roxa on CKD, FibroGen's CEO Thomas Neff stated that the Company would only be reporting top line data in the fourth quarter 2018, and that it would not be able to report the pool MACE analysis in the fourth quarter. *Id* at Ex. B at 12.

The February 27, 2018 disclosure reflects a materialization of the risk created by Defendants' failure to disclose that, based on the safety data from FibroGen's two Phase 3 trials in China, any safety data obtained from the global Phase 3 trials would require post-hoc changes to the stratification factors

to meet the FDA's requirements, thereby explaining the Company's delayed presentation of the MACE analysis and prolonged schedule for submitting to the FDA. On this news, the price of FibroGen shares declined by $2.35 per share, or 5%, on heavy trading volume. *Id.* at Ex. C at 2. Taking into account the February 27, 2018 disclosure, Mr. Sepulveda's "*Dura*" losses would increase substantially. *See, e.g.,* ECF No. 23-3 at 2 (reflecting losses of $179,958.00 on 9-21-18 $55 call option).

Consideration of this February 27, 2018 disclosure demonstrates why it is premature to apply *Dura* at this stage: the purported "*Dura*" analysis is driven by the premature selection of corrective disclosures included, but: (i) there is no operative pleading defining the corrective disclosures; (ii) no pleading filed by Mr. Sepulveda, the Retirement Systems, or Mollo-Branca; (iii) the five separate bare-bones initial complaints filed by other plaintiffs and other counsel neither agree as to the period in which FibroGen securities were trading at artificially inflated prices nor the dates on which the alleged fraud was disclosed; and (iv) after appointment and completing their investigation, the lead plaintiff will surely file a superseding amended consolidated complaint. *See Plumbers & Pipefitters Loc. 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 625 (E.D. Wis. 2009) (noting that, at the lead plaintiff stage, the class "should be defined as the broadest, most inclusive potential class . . . because at the outset of a case the court should . . . narrow the allegations only after the parties have had the opportunity to develop the record").

If appointed, Mr. Sepulveda would maximize both his own recovery and the recovery of the Class by seeking to develop evidence to support additional disclosures that harmed investors. In stark contrast, the competing movants' misguided focus on *Dura* to advance their own motions inhibit their ability to vigorously represent the Class. If the competing movants argue that the only disclosures of the fraud are those identified in the filed complaints thus far, it limits their ability (and the Class') to fully recover the losses caused by the alleged fraud.

The competing movants will likely respond that the alleged corrective disclosures should control at this stage, and that the competing movants cannot commit that it will not develop and assert additional disclosures if appointed Lead Plaintiff. But such a response only highlights why in a case with a long class period, involving varying securities, and where Defendants' longtime fraud leaked

out over multiple partial disclosures, it is virtually impossible to accurately assess financial interest under *Dura*. Thus, applying a "*Dura*" analysis is premature and further investigation and analysis is needed to fully assess each date during Class Period on which news about compliance problems impacts the price of FibroGen securities.

The competing movants' cited authorities only support the notion that a "*Dura*" analysis in here would be inappropriate. *See* ECF No. 51 at 7; ECF No. 52 at 9. For example, in *Enphase*, 2020 WL 7025085, at *3-4, although the court adopted a recoverable loss method tied to *Dura*, it did so only because "Plaintiffs allege a single, discrete, corrective disclosure," and therefore "there is a constant fraud premium across the class period, meaning that the artificial inflation of the price of the security did not dissipate." *Id*. Judge Freeman, however, acknowledged the potential risks in applying this method "where there are multiple partial corrective disclosures over a long period of time." *Id*.

Similarly, in *Mulligan v. Impax Lab'ys, Inc*., 2013 WL 3354420, at *7 (N.D. Cal. Jul. 2, 2013), although it applied a net economic loss method looking to the shares retained at the end of the class period, the *Impax* Court acknowledged that this method works best where there is "relatively constant 'fraud premium' through the class period." In other words, it will not accurately calculate net losses where there are multiple partial disclosures that reveal the purported fraud.[12]

Based on the foregoing, for the competing movants to categorically assert at this early stage of this litigation that Mr. Sepulveda's losses realized prior to May 9, 2019 are not recoverable is to ask the Court to disregard evidence to the contrary, and instead to simply "guess about the effect of … as-yet-unknown factors in selecting a lead plaintiff." *Watchguard*, 2005 U.S. Dist. LEXIS 40923, at 15 n.6.

_____

[12] *See also Perlmutter*, 2011 WL 566814, at *1 (although court considered a recoverable damages method, the case involved an agreed-upon class period and a single corrective disclosure); *Afr. v. Jianpu Tech. Inc*., 2021 WL 1999467, at *2 (S.D.N.Y. May 19, 2021) (acknowledging line of cases where courts have been reluctant to apply *Dura* at the appointment-of-lead-plaintiff stage if a case involves multiple disclosures and the analysis of recoverable losses is murky and lacks sufficient evidence).

**D.      Mr. Sepulveda Is Not Atypical for Trading in Option Contracts**

The competing movants also argue that Mr. Sepulveda is atypical because the majority of his trades were in options. ECF Nos. 51 at 6; 52 at 9-10. But this Court expressed no hesitation in appointing a prolific option trader in *Tesla*. *Isaacs v. Musk*, 2018 WL 6182753, at *4 (N.D. Cal. Nov. 27, 2018).  This is for good reason, as "many courts have appointed options traders as lead plaintiffs to represent the interests of common stockholders." *Hall v. Medicis Pharm. Corp.*, 2009 WL 648626, at *4 (D. Ariz. Mar. 11, 2009) (collecting cases).  In any event, if questions arise as to whether the court may certify the claims of one or more categories of FibroGen investors, those questions should be addressed by a FibroGen investor such as Mr. Sepulveda, who has a financial interest in obtaining class certification for the broadest range of FibroGen investors, including in option contracts. The alternative is a lead plaintiff, like the competing movants, who have no incentive to advocate on behalf of those FibroGen investors and who have tacitly signaled their inclination to simply drop option traders from the class rather than litigate these issues.[13]

Significantly, Mr. Sepulveda also transacted in and lost substantial sums on FibroGen common stock. ECF No. 23-3. These claims are identical to other class members who held common stock. Therefore, Mr. Sepulveda is incentivized to maximize the recovery not only for option traders, but also common stock investors. *See Goldstein v. Puda Coal, Inc.*, 827 F. Supp. 2d 348, 355 (S.D.N.Y. 2011) (dismissing an argument that a party, who sold options in the defendant's stock, could not act as lead plaintiff because the party also traded in common stock and the injuries of the class arose out of the same alleged wrongful conduct); *Medina v. Clovis Oncology, Inc.*, 2016 WL 660133, at *3 (D. Colo. Feb. 18, 2016) ("Although the Arkin Group may have held securities that other members of the class did not, such as options [], the losses allegedly incurred on those securities are still premised on the same factual allegations and legal theories."). For this reason, the competing movants' cases finding

---

[13] *See, e.g.*, *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 293 F.R.D. 483, 488 (S.D.N.Y. 2013) (after appointment of class covering both common stock and options, lead plaintiff carved options out of class definition in amended complaint, thereby prejudicing option trader class members); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 1:10-cv-03461-PAC (S.D.N.Y. Jan. 30, 2015), ECF No. 136 (covering only Goldman "common stock," and thus definitively excluding options traders).

REPLY IFSO MOT. TO CONSOL. REL. CASES, APPOINT LEAD PL. AND APPROVE COUNSEL       - 11
Case No.: 3:21-cv-02623-EMC
010998-11/1567823 V3

certain option traders atypical are distinguishable. *See* ECF No. 51 at 5-6; ECF No. 52 at 9-10.[14]

The Retirement Systems also make much of Mr. Sepulveda's purchase of put options in early-2019 and mid-2020 during the Class Period, claiming he bought them in the hopes that the price of FibroGen stock would decline. ECF No. 52 at 11. Nothing could be further from the truth. Mr. Sepulveda made these transactions online through Schwab's trading application, and in intending to buy call options, Mr. Sepulveda accidentally hit the "put" button. As evidenced in the trade data, in each instance, Mr. Sepulveda immediately sold the put options upon learning of this mistake for zero or *de minimis* losses. *See, e.g.*, ECF No. 23-3 at 22, 28, 30, 42.

**E.    Mr. Sepulveda's Trading during the Class Period Was Not Atypical**

The Retirement Systems incorrectly brand Mr. Sepulveda as a "day trader," who "liquidated his common stock investments alone at least ***thirty different times***, demonstrating he was likely trading on market volatility rather than reliance on the Company's statements." ECF No. 52 at 10. But this argument is disingenuous for several reasons.

***First***, the Retirement Systems focus exclusively on Mr. Sepulveda's class period common stock trades in making this argument, and ignore that Mr. Sepulveda continuously held a long position in FibroGen options throughout the Class Period. ECF No. 52 at 10. ***Second***, the argument ignores the fact that Mr. Sepulveda owned 14,900 shares in pre-class period holdings. *Cf*. ECF Nos. 23-3 at 4 and ECF 50-3. Mr. Sepulveda consistently owned a position in FibroGen common stock throughout the

---

[14] *See, e.g., In re Stitch Fix, Inc. Sec. Litig*., 393 F. Supp. 3d 833, 836 (N.D. Cal. 2019) (applicant found atypical because he "sold only Stitch Fix put options during the class period and he did not buy or sell any Stitch Fix common stock."); *Applestein v. Medivation Inc*, 2010 WL 3749406, at *4 (N.D. Cal. Sept. 20, 2010) (applicant found atypical because he "did not own a single share of Medivation stock during the class period. His claimed losses stem primarily from naked-put option contracts."); *Micholle v. Ophthotech Corp*., 2018 WL 1307285, at *9 (S.D.N.Y. Mar. 13, 2018) (movants atypical because "they purchased no Ophthotech common stock during the Class Period, but instead only traded put and call option contracts in volumes"); *In re Elan Corp. Sec. Litig*., 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009) ("Kleinman traded exclusively in call options, not common stock or ADRs."); *Andrada v. Atherogenics, Inc*., 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (South Ferry "only purchased call options and not any of the underlying Atherogenics common stock that most putative class members purchased."); *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2021 WL 913934, at *4 (D. Utah Mar. 10, 2021) (rejecting applicant "because his losses were based entirely upon the purchase of call options."); *Bricklayers of W. Pa. Pension Plan v. Hecla Min. Co.*, 2012 WL 2872787, at *4 (D. Idaho July 12, 2012) (competing applicant traded exclusively in call options).

entirety of the Class Period and only fully liquidated his FibroGen common stock position on May 26, 2021, well after the Class Period. ECF 23-3 at 8. ***Third***, even though Mr. Sepulveda occasionally bought and sold FibroGen common stock on the same day during the Class Period, even if limiting the inquiry to his class period transactions, a cursory review of his loss chart shows that in many instances Mr. Sepulveda held a position in FibroGen common stock for weeks before he closed the position in the security. *Id.* Given these facts, Mr. Sepulveda was not a "day trader" within the proper meaning of that term: Day traders do not hold positions in securities overnight, let alone weeks.[15] ***Finally***, "a plaintiff's status as a purported 'day trader' is not enough in and of itself to rebut the presumption of adequacy [...] [a]bsent evidence that the [lead plaintiff] did not rely on the market price of the shares." *Schueneman v. Arena Pharms., Inc.*, 2011 WL 3475380, at \*7 (S.D. Cal. Aug. 8, 2011) (collecting cases). Here, the record demonstrates Mr. Sepulveda's reliance on Defendants' statement and the integrity of the market. *See, e.g., infra* at 13-44.

**F.    Sepulveda's Online Statements Concerning FibroGen Underscore His Adequacy and Typicality**

The Retirement Systems also claim that Mr. Sepulveda's posts on Stocktwits, a website where investors can discuss stocks in real time, render Mr. Sepulveda atypical and inadequate. That is not true. ECF No. 52 at 11-12. There is nothing uncommon about investors talking about the companies they invest in or the reasons for their investments. In fact, it would be unusual to find that investment personnel at the Retirement Systems did not make notes or write down the reasons they made their investment decisions to invest in FibroGen. That is likely the reason why the Retirement Systems cite no cases to support their position that commentary by an investor about a stock automatically renders the investor atypical or somehow means the investor did not rely on the integrity of the market.

Rather, in a desperate attempt to find something where there is nothing, the Retirement Systems pull two quotes completely out of context, and switch the sequence of Mr. Sepulveda's posts around, to claim that Mr. Sepulveda "effectively encouraged" management to manipulate FibroGen's stock.

---

[15] *See* Financial Industry Regulation Authority Rule 4210(f)(8)(B)(i) (defining "day trading" as "the purchasing and selling or the selling and purchasing of the same security on the same day in a margin account").

Nothing could be further from the truth. ECF No. 52 at 12. The full text of the January 6, 2020 post in question, however, makes clear that Mr. Sepulveda was commenting on the work new FibroGen CEO Enrique Conterno would have to do in order to benefit from his stock options in contrast to FibroGen's prior CEO Thomas B. Neff; there is nothing nefarious about that:

> $FGEN (/symbol/FGEN) New CEO's bulk of compensation is "300,000 stock options at an exercise price of $43.35 the price of the close on January 6th". This is GREAT!!! If the CEO wants the stock, he much pay $43.35 a share, and then sell it for more... he would certainly hope. GREAT contract by FGEN's Board for this new CEO!!! He made $5-Million a year at Eli Lilly.... now FGEN offered him only $800,000 in salary... plus 300,000 shares of stock... but at $43.35 a share to buy them to sell. So, this guy has got to pump the stock to make his pay. Wow!!! Great Contract by the Board. Re: By contrast, Tom Neff received almost all of his stock for $0.00 (zero) per share. No motivation, other than self-serving Motivation on Neff's part.

*See* ECF 53-1 at 3.

Likewise, the full text of the February 12, 2020 post bares no relation to the January 6, 2020 post and reflects Mr. Sepulveda's commentary that he thought that the prior CEO Neff held back on the good news that started streaming out under the new CEO Conterno.

> $FGEN (/symbol/FGEN) If this was any other Biotech Company in the world.... this common stock would be skyrocketing!!! Given the last 4 months' steady stream of incredibly positive events... again shows just how badly this stock's value was manipulated during the previous 5 years by Tom Neff. Individual traders keep selling if the stock goes up a couple of bucks... understandable since the stock has been in the mud for 5 years.... but look at the SEC filings of the big mutual funds... loading up and holding all the stock for the payoff to come. They now own more than 70% of the company. Incredible difference.

*Id.* at 2. In both cases Mr. Sepulveda is very bullish on FibroGen, and in complete alignment with the Class' claims.

The Retirement Systems also fault Mr. Sepulveda's characterization of Defendants' stock sales during portions of the Class Period as insignificant as "contradictory to the allegations that plaintiffs make in this case." ECF No. 52 at 12. First, Mr. Sepulveda's opinion that the particular sales of a couple of individuals is just that: his opinion before the fraud was disclosed. But Mr. Sepulveda is also correct in his observations, at the time of his statements, the "Pre-Arranged sales for Internal Revenue Service (IRS) purposes" do not reflect "employee sentiment towards the stock FGEN." Again, it is

unfortunate that the Retirement Systems found the need to take Mr. Sepulveda's astute observations out of context, in order to attack Mr. Sepulveda's adequacy and typicality. To the contrary, Mr. Sepulveda's commentary demonstrates his deep knowledge of the company and the attention to detail he will devote in representing the Class.

**G.      Alternatively, Mr. Sepulveda Should be Appointed Co-Lead Plaintiff**

If the Court declines to appoint Mr. Sepulveda as Lead Plaintiff, the Court should alternatively appoint Mr. Sepulveda as Co-Lead to protect the total interests of the Class. *See Miller v. Ventro Corp.*, 2001 WL 34497752, at *9 (N.D. Cal. Nov. 28, 2001) ("[T]he decision to create a separate class or co-lead plaintiffs is within the discretion of the Court"). Appointing Mr. Sepulveda and his counsel to a "co-lead" structure would benefit the class because Mr. Sepulveda would protect the class from unnecessary challenges to the other movants' standing, adequacy, and other unique defenses. Indeed, due to the different securities that Mr. Sepulveda traded in during the Class Period, he can assist the representation of different constituencies within the class.

### III.      CONCLUSION

For all the foregoing reasons, Mr. Sepulveda respectfully requests that this Court: (1) consolidate the Related Actions; (2) appoint him to serve as lead plaintiff in this action; (3) approve his selection of Hagens Berman as lead counsel for the Class; and (4) grant such other and further relief as the Court may deem just and proper.  Alternatively, Mr. Sepulveda requests that the Court include him as a co-lead plaintiff in any group of lead plaintiffs who may be appointed.

Respectfully submitted,

Dated: July 2, 2021                              HAGENS BERMAN SOBOL SHAPIRO LLP

By:    */s/ Lucas E. Gilmore*
          LUCAS E. GILMORE

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
Danielle Smith (291237)
Wesley A. Wong (314652)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000

Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com
danielles@hbsslaw.com
wesleyw@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Attorneys for [Proposed] Lead Plaintiff Vicente Sepulveda and [Proposed] Lead Counsel*

REPLY IFSO MOT. TO CONSOL. REL. CASES, APPOINT LEAD PL. AND APPROVE COUNSEL        - 16
Case No.: 3:21-cv-02623-EMC
010998-11/1567823 V3